**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**OCEANUS PERRY,**              **CASE NO. 2:08-cv-911**
                               **CRIM. NO. 2:02-cr-159**
      **Petitioner,**              **JUDGE EDMUND A. SARGUS, JR.**
                               **MAGISTRATE JUDGE E.A. PRESTON DEAVERS**
**v.**

**UNITED STATES OF AMERICA,**

      **Respondent.**
                    <u>**ORDER and**</u>
             <u>**REPORT AND RECOMMENDATION**</u>

Petitioner, a federal prisoner, has filed the instant motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255. This matter is before the Court on the instant petition, Respondent's return of writ, Petitioner's traverse, and the exhibits of the parties.

For the reasons that follow, the Magistrate Judge **RECOMMENDS** that Petitioner's motion to amend his § 2255 petition be **DENIED,** with the exception of his request to amend the language of habeas corpus claim five. The Magistrate Judge further **RECOMMENDS** that this action be **DISMISSED**.

Petitioner's motion to disqualify the government's reply (Doc. 78), is **DENIED.** His motion to supplement his habeas corpus petition with copies of pages of the trial transcripts, (Doc. 90), is **GRANTED**. Petitioner's motion to proceed *in forma pauperis* (Doc. 89), is **DENIED**, as moot.

**MOTION TO DISQUALIFY GOVERNMENT'S RESPONSE**

Petitioner requests that the Return of Writ be stricken, asserting that he did not receive a copy of the government's response until December 9, 2008. *See Disqualification of Government's Reply*, Doc. No. 78. The docket, however, indicates that Respondent filed the Return of Writ, as required, on November 18, 2008, and sent a copy to Petitioner at the address he had used when filing

his § 2255 petition.  *See* Doc. Nos. 71, 77.  Thereafter, on December 11, 2008, Respondent filed an *Amended Certificate of Service* indicating that the mailing had been returned as undeliverable.  On December 11, 2008, Respondent mailed another copy of the Return of Writ to Petitioner at the address reflected on Petitioner's December 8, 2008 letter notifying the Court that he had not received a copy of the Return of Writ.  *See* Doc. Nos. 76, 77.  Petitioner now has received a copy of the Return of Writ.  On December 30, 2008, the Court granted Petitioner's request for an extension of time to file a reply.  *See* Doc. Nos. 79, 80.

Because Petitioner has suffered no prejudice, his motion to disqualify the government's reply is **DENIED.**

### MOTION TO AMEND THE PETITION WITH NEW CLAIMS

On December 9, 2010, Petitioner filed a motion to amend his habeas corpus petition.  (Doc. 88.)  To the extent that he requests to alter the language of habeas corpus claim five, his motion is **GRANTED**.  To the extent that Petitioner seeks to add new additional claims, those claims are barred by the one-year statute of limitations.  His request is, therefore, is **DENIED.**

In his memorandum in support of his motion to amend his habeas corpus petition, Petitioner asserts that lack of subject matter jurisdiction voids his conviction.  He maintains now that the indictment did not state a federal offense on its face, and that jurisdiction was only assumed but never proven.  "The relief should be dismissal of the case and overturn of [sic] conviction." (*Motion to Amend Petition*, Doc. 88.)  He also asserts that he was denied effective assistance of counsel because his attorney failed to challenge the jurisdiction of the Court, failed to investigate, advised Petitioner to refrain from filing pro se motions, and that the jury instructions were "misleading and in error."  (Id.) Petitioner has attached exhibits in support of these claims.

2

28 U.S.C. § 2255(f) imposes a one-year statute of limitations in federal habeas corpus proceedings:

> A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of-
>
> (1)    the date on which the judgment of conviction becomes final;
>
> (2)    the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> (3)    the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4)    the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f). Further, Petitioner did not raise these claims in his (thirty-six page) September 19, 2008, motion to vacate, set aside or correct sentence. (Doc. 66). In his original Petition, Petitioner asserted that he was denied effective assistance of counsel because his attorney refused to let him testify, failed to raise a speedy trial claim, failed to attempt to suppress testimony of key government witnesses, and failed to argue that the evidence was insufficient to sustain his convictions. Petitioner additionally asserted that he was denied a fair trial due to a biased judge and judicial misconduct, because he was forced to wear shackles during trial, that the evidence was constitutionally insufficient to sustain his convictions, that he was unconstitutionally sentenced, and that he was denied the effective assistance of appellate counsel. *See id.*

Because the statute of limitations has now long since expired,[1] Petitioner's new untimely claims are time-barred unless the claims "relates back" to his initial and timely-filed § 2255 petition. *See Mayle v. Felix,* 545 U.S. 644, 649 (2005). "An amended habeas petition ... does not relate back (and thereby escape AEDPA's one-year time limit) when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth. *Id.* at 664. "So long as the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order. . . ." *Id.* In a footnote, the Supreme Court gave examples of claims "tied to a common core of operative facts" that would relate back to the original filing:

> For example, in *Mandacina v. United States,* 328 F.3d 995, 1000-1001 (C.A.8 2003), the original petition alleged violations of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), while the amended petition alleged the Government's failure to disclose a particular report. Both pleadings related to evidence obtained at the same time by the same police department. The Court of Appeals approved relation back. And in *Woodward v. Williams,* 263 F.3d 1135, 1142 (C.A. 10 2001), the appeals court upheld relation back where the original petition challenged the trial court's admission of recanted statements, while the amended petition challenged the court's refusal to allow the defendant to show that the statements had been recanted. *See also 3 J. Moore, et al., Moore's Federal Practice* § 15.19[2], p. 15-82 (3d ed.2004) (relation back ordinarily allowed "when the new claim is based on the same facts as the original pleading and only changes the legal theory").

*Mayle,* 545 U.S. at 664 n.7. The United States District Court for Arizona has summarized the Supreme Court's holding as follows:

> In adopting a "time and type" analysis for relation back, the Court followed the majority of circuit courts that had resolved that new claims differing in both time and type do not relate back to a timely-

---

[1] The one-year statute of limitations expired on October 1, 2008, one year after the United States Supreme Court denied Petitioner's petition for a writ of *certiorari* from Petitioner's appeal of his re-sentencing.

filed petition. *See Davenport v. United States,* 217 F.3d at 1341, 1346 (11th Cir.2000) (stating that newly-offered claims of [ineffective assistance of counsel] do not relate back to timely-filed claims of [ineffective assistance of counsel] because they were based on different sets of facts); *United States v. Pittman,* 209 F.3d 314, 317-18 (4th Cir.2000) (stating that claims regarding obstruction of justice enhancement and failure of counsel to file an appeal do not relate back to claims that the district court lacked jurisdiction to impose an enhanced sentence and the government failed to establish by a preponderance of the evidence that the drugs at issue were crack cocaine); *United States v. Duffus,* 174 F.3d 333, 337-38 (3rd Cir.1999) (stating that a claim of [ineffective assistance of counsel] for failing to move to suppress evidence did not relate back to a claim of [ineffective assistance of counsel] for failing to contend on appeal that evidence was insufficient to support conviction); *United States v. Craycraft,* 167 F.3d 451, 457 (8th Cir.1999) (stating that [ineffective assistance of counsel] claims alleged in a timely-filed petition were separate from other [ineffective assistance of counsel] claims because "[f]ailing to file an appeal is a separate occurrence in both time and type from a failure to pursue a downward departure or failure to object to the type of drugs at issue"). However, in contrast, if the new claim merely clarifies or amplifies a claim or theory already in the original petition, the new claim may relate back to the date of the original petition and avoid a time bar. *See Woodward v. Williams,* 263 F.3d 1135, 1142 (10th Cir.2001).

*Schurz v. Schriro,* No. CV-97-580, 2006 WL 89933, *3 (D. Ariz. Jan. 11, 2006).

Petitioner's new claims raised in his motion to amend differ in time and type from his claims of ineffective assistance of counsel. Such claim is not tied to a "common core of operative facts" as his ineffective assistance of counsel claims.

Therefore, the Magistrate Judge **RECOMMENDS** that Petitioner's motion to amend his § 2255 petition with new claims be **DENIED**, with the exception of his request to alter the language of habeas corpus claim five.  The Court accepts and considers Petitioner's altered language of claim five.

## FACTS and PROCEDURAL HISTORY

The United States Court of Appeals for the Sixth Circuit summarized the facts and procedural history of this case as follows:

> At approximately 2:40 p.m. on December 4, 2001, defendant Oceanus Perry entered a National City Bank ("NCB") branch in Columbus, Ohio. Carrying a black and tan "JanSport" type bookbag over his shoulder, Perry wore a black leather overcoat and a baseball cap. Perry approached Megan Bollmeyer, a bank teller. As Perry set his bag on the counter, Bollmeyer heard a "clanking sound." Perry then retrieved two $50 bills and, after receiving his requested change for each bill, he remained at the counter for several minutes counting his money before leaving.
>
> Perry re-entered the bank minutes later, approached NCB Teller Nikkili Smith and, after placing his bookbag on the counter, he asked to purchase three money orders. After Smith completed the money orders and handed them to Perry, he reached into his bookbag and pulled out a black semi-automatic firearm. Pointing the weapon at various bank employees, Perry demanded all of the money in teller drawers and instructed Smith not to include any dye packs or bait money. Two bank tellers gathered money from their drawers and, at Perry's direction, placed the money into his backpack without including bait money or dye packs.
>
> Perry then fled the scene, and the police were called. An investigation of the crime scene enabled authorities to obtain copies of the money orders sold to Perry and bank surveillance photographs. A subsequent audit revealed that $6,058 was missing from Smith's and Bollmeyer's teller drawers.
>
> Weeks later, at approximately 9:37 a.m. on January 26, 2002, Perry entered a Liberty, Ohio, branch of Metropolitan Bank carrying a black shoulder bookbag and wearing a dark jacket, baseball hat, and glasses. He approached a counter and sought change for a $50 bill. Upon receiving his change, Perry stood in the lobby for roughly four minutes counting his change and looking at brochures. As he left the bank, Perry attempted to use a Metropolitan Bank ATM machine in the parking lot but, after experiencing some difficulty, he re-entered the bank and sought help. Metropolitan Bank teller Kara Morgan informed Perry that his ATM card belonged to the 717 Credit Union, and, as a result, she could not tell if funds were available for

withdrawal. Although Perry then departed the bank, surveillance cameras captured his subsequent ATM transaction at the Metropolitan Bank parking lot machine.

Roughly ten minutes later, on that same morning, Perry entered Bank One wearing a baseball cap, black leather jacket, and carrying a black leather shoulder bag. He approached Bank One teller Christina Will, placed his bag on the counter, and asked to purchase money orders. Upon learning that Bank One did not sell money orders, Perry produced a $50 bill and asked for change. As Will complied with his request, Perry reached into his bag, retrieved a black semi-automatic firearm, pointed it at Will, and demanded all of her money. After Will provided Perry with the money, Perry put the money into his bag, along with the gun, and fled from the bank. [FN1] Unbeknownst to Perry, however, Will also gave him a dye pack. Again, bank surveillance photos captured the robbery.

> FN1. This second robbery took place in the Northern District of Ohio. For his role in this offense, Perry was separately tried and convicted in the Northern District of Ohio for armed bank robbery and using a firearm in a crime of violence. Following his conviction for committing the Bank One robbery, Perry was sentenced to serve forty-one months incarceration on Count I (violation of 18 U.S.C. §§ 2113(a) & (d)) and eighty-four months on Count II (using and carrying a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)). Perry was then transferred to the Southern District of Ohio on December 16, 2003.

After watching a local news story about the Bank One robbery, Metropolitan Bank Teller Morgan informed the appropriate authorities that she recognized Perry as the individual who had entered her bank ten minutes before the Bank One robbery. FBI agents then reviewed the Metropolitan Bank ATM journal tape, which reflected a transaction at 9:46 a.m. on the day of the robbery withdrawing money from an account in the name of Perry's mother. FBI agents thereafter obtained a Department of Motor Vehicles photograph of Perry and composed a photographic lineup containing Perry's picture, which they showed to Morgan, who identified Perry.

Agents then discovered that Perry was living in Columbus, Ohio, while attending Ohio State University. On February 8, 2002, agents arrested Perry at the apartment he shared with his girlfriend. In doing so, agents discovered that Perry was carrying an empty gun holster

and a 717 Credit Union ATM card in his wallet, which had the same number as the card used at Metropolitan Bank on the day of the robbery. A consent search of the apartment uncovered a black .45 caliber firearm, which matched the description of the firearm used in both robberies and possessed red dye stain and tear gas residue. A subsequent search of Perry's vehicle revealed a black backpack with a tan bottom matching the description of the bag used in the NCB robbery. Agents also found mail addressed to Perry at his address in Columbus and at his mother's residence in Hubbard, Ohio.

Upon hearing the details of the Bank One robbery, FBI Special Agent Harry W. Trombitas, bank robbery coordinator for the FBI's Columbus, Ohio, office, suspected a connection between that robbery and the December 4, 2001, NCB robbery. Agent Trombitas showed his photo array to three NCB employees on duty at the time of the robbery. Of those employees, only Bollmeyer identified Perry's photograph from the lineup as the individual who robbed NCB. Agent Trombitas also showed surveillance photographs from the NCB robbery to several of Perry's acquaintances; namely, his girlfriend Monique Bland, his former employer Willie Young, and his friend Shawn Graham. Although neither Bland, nor Graham, recognized Perry, Young identified Perry as the individual shown in the surveillance photographs.

Based on the totality of the foregoing information, a grand jury returned a two-count indictment against Perry on October 8, 2002, charging him with the armed robbery of National City Bank and brandishing a firearm during a crime of violence. Following his arraignment on January 9, 2004, *see* note 1, *supra,* Perry filed a motion in limine seeking to prohibit the government from introducing evidence related to his conviction for the Bank One robbery. After hearing testimony and reviewing surveillance photographs from both robberies, the district court held that evidence of the Bank One robbery was admissible on the issue of the robber's identity.

In particular, the court observed that "identity is the largest single issue in this case" and, as such, "[e]stablishing identity is a proper grounds [sic] for the admission of other act evidence under Rule 404(b)." The court alternatively concluded that evidence of the Bank One robbery was admissible to show a modus operandi. Finally, the court concluded that the value of the evidence outweighed any prejudicial impact of its admission. The court did, however, give limiting instructions concerning the purpose for this evidence at several points during trial: (1) prior to the testimony of the first Bank

One witness, (2) following the testimony of the second Bank One witness, (3) before the first Metropolitan Bank witness, and (4) during the final jury charge.

Following the court's final instructions, the jury retired to deliberate. During their deliberations, the jury sent a written note to the court querying as follows: "[y]our Honor, within the bookbag there are papers that are open. May we look at these and consider them?" In response, the court ordered the courtroom deputy to retrieve the exhibit and thereafter sought counsel's advice on how to proceed. Defense counsel proposed that the court advise the jury "that there were some papers that were inadvertently left within the book bag, that those papers were not identified at any point in the trial, nor were they ever admitted as evidence, and therefore they are inappropriate for the jury to consider ...." The court agreed with defense counsel, instructed the jury accordingly, and the jury thereafter returned a guilty verdict.

Perry was sentenced on October 21, 2004.[2] At that hearing, the court

---

[2]     Before sentencing the case was transferred to a different district judge. The judge presiding over the conviction proceedings recused himself from sentencing because he had received threatening letters from Perry. The new judge declined to add a two-level adjustment to Perry's offense-level calculation for obstruction of justice on account of these letters and sentenced Perry to 63 months for the bank robbery charge, 41 months of which was to run concurrently with the sentence imposed by the Northern District of Ohio on the earlier unrelated robbery and brandishing charges and 22 months of which was to run consecutively to them.

Section 924(c) requires that a district court impose a mandatory minimum sentence for brandishing a firearm during a crime of violence. This mandatory minimum is in addition to any sentence the defendant receives for the underlying crime of violence. 18 U.S.C. § 924(c)(1)(A). The minimum penalty for the first conviction for brandishing under § 924(c) is 7 years. § 924(c)(1)(A)(ii). The minimum penalty for any subsequent conviction for brandishing is 25 years. § 924(c)(1)(C)(i). In this case, the 41-month concurrent portion of Perry's sentence for bank robbery, while concurrent with the 41-month sentence Perry received for bank robbery in the Northern District, did not overlap

>       sentenced Perry to sixty-three months imprisonment for Count I
>       (armed bank robbery), only twenty-two months of which would run
>       consecutively to his sentence for committing the Bank One robbery.
>       Perry also received an additional twenty-five years imprisonment on
>       Count II (use of a firearm during a crime of violence), which would
>       run consecutively to his Count I sentence, as well as consecutively to
>       the sentence imposed following the Bank One robbery. The court
>       further imposed a term of supervised release, a $200 special
>       assessment, and $6,058 in restitution to NCB.

*United States v. Perry*, 438 F.3d 642, 645-647 (6th Cir. 2006). Petitioner filed a timely appeal  in

which he asserted that the District Court abused its discretion by admitting evidence of the Bank

One robbery and testimony of FBI Agent Trombitas; that it was plain error for the district court to

admit identification testimony from Perry's girlfriend Monique Bland, his former employer Willie

Young, and his friend Shawn Graham; that the District Court improperly instructed the jury on the

government's burden of proof and improperly handled the jury note inquiring into whether they

could review the contents of his bookbag; and it was plain error for the District Court to sentence

him to the twenty-five year consecutive sentence pursuant to 28 U.S.C. § 924(c); and that his

sentence violated *United States v. Booker*, 543 U.S. 220 (2005).  On February 24, 2005, the Court

of Appeals for the Sixth Circuit affirmed Petitioner's convictions and sentence for use of a firearm,

---

>       with the mandatory 7-year sentence for brandishing a firearm
>       during that crime. The judge in this case also sentenced Perry to
>       the mandatory 25 years on the brandishing count, which is required
>       by statute to run consecutively to all of his other sentences. As a
>       result, the combined sentence is 37 years and 3 months; 7 years for
>       the first brandishing offense, 25 years for the second brandishing
>       offense, 41 months for the first bank robbery, and 22 months of
>       consecutive time for the second bank robbery.

*See United States v. Perry*, 228 Fed.Appx. 557, 558, 2007 WL 1113264 (6th Cir. April 13, 2007).

but remanded the case for resentencing on his conviction for armed bank robbery. *United States v. Perry,* 438 F.3d at 642. On May 15, 2006, the United States Supreme Court denied Petitioner's petition for a writ of certiorari. *Perry v. United States*, 547 U.S. 1139 (2006). Meanwhile, on April 6, 2006, the district judge reimposed the 63-month sentence, again with 41 months to run concurrently with and 22 months to run consecutively to Perry's earlier Northern District sentence. *United States v. Perry*, 228 Fed.Appx. 557, 2007 WL 1113264 (6th Cir. April 13, 2007). Petitioner again filed a timely appeal in which he asserted his renewed sentence was unreasonable and that the jury instruction that led to his conviction was improper. *Id*. On April 13, 2007, the Sixth Circuit affirmed the judgment of the District Court. *Id*. On October 1, 2007, the United States Supreme Court denied Petitioner's petition for a writ of certiorari. *Perry v. United States*, 552 U.S. 861 (2007).

On September 25, 2008, Petitioner filed the instant *pro se* motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255.[3] He asserts as follows:

> 1. Movant denied his Sixth Amendment right to effective assistance of counsel.
>
> Counsel refused to let Perry testify, failed to raise speedy trial claim, failed to attempt suppression of key government witness, failed to inform jury that the evidence against Perry was not overwhelming and thus Perry was entitled to a not guilty verdict.
>
> 2. Movant's Fifth Amendment right to due process by biased judge/judicial misconduct.
>
> Abuse of discretion not to hold hearing on or dismiss the indictment for speedy trial violation, refused to let movant change counsel, abuse of discretion by allowing evidence from cases that should have been

---

[3] This Court has granted Petitioner's request to alter the language of his allegations in claim five.

joined but when separated created prejudice and tactical advantage, judge recused himself after trial amid objections to conduct but did not order new proceedings.

3.  Movant's Fifth Amendment right to due process was violated by lack of individual acessment [sic].

Movant forced to wear handcuffs, shackles and belly chain during sentencing.

4.  Verdict contrary to evidence presented/evidence against defendant not overwhelming.

Negative witness identification [of] defendant, fingerprints left by perpetrator were not defendant's, no evidence of robbery found in defendant's possession.

5.  Sentences similar to the Movant's have been found unconstitutional by the Supreme Court.

Sentencing guidelines ruled unconstitutional by the Supreme Court, defendant sentenced to term of supervised release, supervised release is not a condition of punishment of any statute defendant convicted of.

6.  Movant denied Fourteenth Amendment right to effective assistance of counsel by appellate counsel.

Counsel's decision not to raise certain claims which were requested by the defendant may have prejudiced defendant through prohibition of claims.

It is the position of the Respondent that Petitioner's claims are without merit.

## CLAIMS ONE AND SIX:  INEFFECTIVE ASSISTANCE OF COUNSEL

The right to counsel guaranteed by the Sixth Amendment is the right to the effective assistance of counsel.  *McMann v. Richardson,* 397 U.S. 759, 771 n.14 (1970).  The standard for reviewing a claim of ineffective assistance of counsel is twofold:

> First, the defendant must show that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington,* 466 U.S. 668, 687 (1984); *see also Blackburn v. Foltz,* 828 F.2d 1177 (6th Cir. 1987). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689.

To establish prejudice, the Petitioner must show that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because Petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance, if the Court determines that Petitioner has failed to satisfy one prong, it need not consider the other. *Id.* at 697.

The *Strickland* test applies to appellate counsel. *Burger v. Kemp,* 483 U.S. 776 (1987). Counsel must provide reasonable professional judgment in presenting the appeal. *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985). " '[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray,* 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes,* 463 U.S. 745, 751-52 (1983)). Of course, not every decision made by appellate counsel can be insulated from review merely by categorizing it as strategic. The Court of Appeals for the Sixth Circuit has identified the following considerations that ought to be taken into account in determining whether

counsel on direct appeal performed reasonably competently:

> A    Were the omitted issues "significant and obvious?"
>
> B.   Was there arguably contrary authority on the omitted issues?
>
> C.   Were the omitted issues clearly stronger than those presented?
>
> D.   Were the omitted issues objected to at trial?
>
> E.   Were the trial court's rulings subject to deference on appeal?
>
> F.   Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
>
> G.   What was appellate counsel's level of experience and expertise?
>
> H.   Did the Petitioner and appellate counsel meet and go over possible issues?
>
> I.   Is there evidence that counsel reviewed all the facts?
>
> J.   Were the omitted issues dealt with in other assignments of error?
>
> K.   Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Mapes v. Coyle,* 171 F.3d 408, 427-28 (6th Cir. 1999). The Sixth Circuit cautioned, however, that this list is not exhaustive and need not produce a certain "score." *Id.* at 428.

**A.    Speedy Trial**

Petitioner asserts that he was denied the effective assistance of counsel because his attorney refused to file a motion to dismiss the charges based on a violation of his right to a speedy trial, and because appellate counsel failed to raise this issue on direct appeal.

14

18 U.S.C. § 3161(c)(1) provides:

> In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs.

18 U.S.C. § 3162(a)(2) sets out the penalties for a violation of § 3161(c)(1), as follows:

> If a defendant is not brought to trial within the time limit required by section 3161(c) as extended by section 3161(h), the information or indictment shall be dismissed on motion of the defendant. The defendant shall have the burden of proof supporting such motion, but the Government shall have the burden of going forward with the evidence in connection with any exclusion of time under subparagraph 3161(h)(3). In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice. Failure of the defendant to move for dismissal prior to trial or entry of a plea of guilty or nolo contendere shall constitute a waiver of the right to dismissal under this section.

The Court conducted Petitioner's initial appearance on January 8, 2004.  (Doc. No. 4.) Referring, *inter alia,* to *United States v. O'Dell*, 154 F.3d 358, 362 (6th Cir. 1998), Respondent contends that the speedy trial clock did not begin to run until January 9, 2004, the date that Petitioner was arraigned and entered a not guilty plea.   However, in *United States v. Tinklenberg*, 579 F.3d 589, 593-594 (6th Cir.  2009), the United States Court of Appeals for the Sixth Circuit rejected this same argument, noting:

> *O'Dell* is inapposite. In *O'Dell*, the defendant initially agreed to plead guilty to manufacturing marijuana pursuant to an information before

an indictment was ever filed, and then subsequently withdrew his plea. 154 F.3d at 359. The government then indicted him for the first time, and he pled not guilty. *Id*. at 359-60. This Court held that the defendant's indictment represented an entirely new case against the defendant, and that the defendant's initial appearance after that indictment, when he pled not guilty, triggered the Speedy Trial clock. *Id*. at 362. This Court found that the clock never started in the defendant's earlier case, because he never entered a not guilty plea in the earlier case. Thus, *O'Dell* stands only for the proposition that the Speedy Trial Act does not apply to a case in which the defendant never pleads not guilty. Although this Court opined that the Speedy Trial Act "requires a not guilty plea to begin the clock running," that statement was irrelevant to the outcome of the case and was therefore *dicta*. *See United States v. Lopez-Valenzuela*, 511 F.3d 487, 490 (5th Cir.2007) (concluding that this Court's finding in *O'Dell* that a defendant's not guilty plea starts the seventy day period was *dicta*).

In short, although the Speedy Trial Act applies only to cases in which the defendant has entered a not guilty plea, the initial appearance after the indictment is the event that triggers the seventy day period.

*Id*. at 594. Therefore, this Court likewise concludes that Petitioner's January 8, 2004, initial appearance triggered the running of the seventy day period under the Speedy Trial Act. Therefore, this seventy day period expired on March 18, 2004. The Court initially scheduled trial for March 1, 2004. (*See* Doc. 8.) However, on January 22, 2004, the government requested a continuance of the trial date because counsel for the government was scheduled to be in trial before another judge in this Court on February 23, 2004, and that trial was expected to last two or three weeks. Additionally, the government needed additional time to locate witnesses, because the alleged offense had been committed over two years earlier. *See* Doc. Nos. 13, 14. Defense counsel had no objection to the continuance. The Court granted Respondent's request for a continuance, finding that a continuance was "[w]arranted in the interests of justice and that the need for a continuance outweighs the best interests of the defendant and the public in a speedy trial." *Order*, January 28, 2004, Doc. No. 14. On March 22, 2004, four days after the seventy day period would have expired,

trial began.  Doc. No. 25.

Under 18 U.S.C. § 3161(h), the following period of delay shall be excluded in computing the time within which the trial must commence:

> (7)(A) Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice served by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

18 U.S.C. § 3161(h)(7)(A).[4]  As required by the statute, the District Court affirmatively set forth

---

[4]  The Act further provides:

> (B) The factors, among others, which a judge shall consider in determining whether to grant a continuance under subparagraph (A) of this paragraph in any case are as follows:

> (i) Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice.

> (ii) Whether the case is so unusual or so complex, due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within the time limits established by this section.

> (iii) Whether, in a case in which arrest precedes indictment, delay in the filing of the indictment is caused because the arrest occurs at a time such that it is unreasonable to expect return and filing of the indictment within the period specified in section 3161(b), or because the facts upon which the grand jury must base its

and weighed the appropriate § 3161(h)(7) factors.  The Court provided a rationale for granting the continuance in a written order, which clearly set forth the bases for postponing the trial date.  *See United States v. Strickland*, 342 Fed.Appx. 103, unpublished, 2009 WL 2461094 (6th Cir. Aug. 12, 2009)(holding that any period of delay resulting from a continuance is excluded time under the Speedy Trial Act if the judge finds the interests of justice outweigh the best interests of the Defendant and the public in a speedy trial.)  Further, Petitioner had no objection to the continuance.

Additionally, on March 16, 2004, Petitioner filed a motion *in limine* to exclude 404(b) evidence.  Doc. No. 18.  The Court resolved that motion, after a hearing, on March 22, 2004, the first day of trial.  *See* Doc. No. 25.  18 U.S.C. § 3161(h)(1)(D) provides that any "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion" shall be excluded in computing the time within which the trial must commence.  18 U.S.C. § 3161(h)(1)(D).  Therefore, this six day period also is excluded from

---

determination are unusual or complex.

(iv) Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

(C) No continuance under subparagraph (A) of this paragraph shall be granted because of general congestion of the court's calendar, or lack of diligent preparation or failure to obtain available witnesses on the part of the attorney for the Government.

18 U.S.C. § 3161(h)(7)(B), (C).  Additionally, any period of delay resulting from the absence or unavailability of the defendant or an essential witness is excluded from the time computed within which the trial must commence.  18 U.S.C. § 3161(h)(3)(A).

18

computing the time period in which the trial was required to commence, making the March 22, 2004, trial date within the time period set forth by the Speedy Trial Act.[5]

In short, the record fails to reflect a violation of the Speedy Trial Act.

The record similarly fails to reflect that Petitioner was denied his right to a speedy trial under the Sixth Amendment. In considering whether a defendant's Sixth Amendment right to a speedy trial has been violated, the Court must conduct a balancing test weighing the following four factors: 1) the length of the delay; 2) the reason for the delay; 3) the defendant's assertion of his right; and 4) prejudice to the defendant. *Barker v. Wingo,* 407 U.S. 514, 530 (1972); *Doggett v. United States*, 505 U.S. 647, 651 (1992).

The length of the delay for speedy trial purposes is measured from the earlier of the date of the indictment or the date of the arrest. *Cain v. Smith*, 686 F.2d 374, 381 (6th Cir. 1982). The delay must be presumptively prejudicial before the court need inquire into the other factors that go into the balance. *Barker,* 407 U.S. at 530. Whether the delay is presumptively prejudicial is determined by the nature and complexity of the crime. *Redd v. Sowders*, 809 F.2d 1266, 1269 (6th Cir. 1987). The more serious the crime, the shorter the toleration of delay. *Id*.

On October 8, 2002, while in the custody of the Northern District of Ohio awaiting trial on the robbery of Bank One, Petitioner was indicted on charges involving the bank robbery of National

---

[5] Petitioner also filed on January 14, 2004, various motions for discovery, *see* Doc. Nos. 9-12, which the Court resolved in an order dated February 13, 2004. Doc. No. 16. These motions also arguably tolled the time period within which Petitioner's trial needed to commence under the Speedy Trial Act. *See United States v. Young*, 2000 WL 1140778 (S.D. Ohio 2000)("there is no authority for excluding some pretrial motions on the basis that they do not require a significant amount of thought or attention by the court")(citing *United States v. Mentz*, 840 F.2d 315, 327 n.25 (6th Cir. 1988)(other citations omitted)). Under this interpretation, Petitioner, too, has failed to establish a Speedy Trial Act violation.

City Bank, located in Columbus, Ohio, and within the Southern District of Ohio.  A warrant for his arrest was issued on October 10, 2002.  Jury trial commenced in the Southern District of Ohio on March 22, 2004.  *See* Doc. No. 26.  This delay is sufficient to trigger consideration of the remaining factors under *Barker*.  *See Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992)(postaccusation delay, as it approaches one year, marks the point at which courts deem the delay unreasonable enough to trigger the *Barker* enquiry); *see also United States v. Mahan*, 492 F. Supp. 2d 822, 828 (S.D. Ohio 2006)(same).

Under the second factor of *Barker*, "[t]he core task is determining which party shoulders the balance of blameworthiness for this delay*." United States v. O'Dell*, 247 F.3d 655, 667 (6th Cir. 2001)(footnote omitted).

> [D]ifferent weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government. A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant. Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

*Barker v. Wingo*, 407 U.S. at 531 (footnote omitted).  The Supreme Court has "indicated on previous occasions that it is improper for the prosecution intentionally to delay 'to gain some tactical advantage over (defendants) or to harass them.'" *Id*. at n.32 (quoting *United States v. Marion,* 404 U.S. 307, 325 (1971)).

Petitioner complains that it took fourteen days to extradite him from the Northern District of Ohio for trial.  He states that his trial in the Northern District began in June 2003, and he was

sentenced in late August 2003.[6]  *Petition,* at 4.  Petitioner further contends that the lengthy delay

pending resolution of his trial in on bank robbery charges in the Northern District weighs in his

favor, because the government could have joined the charges against him with his trial in this case.

*Petition*, at 5.

However, under Federal Rule of Criminal Procedure 18:

> unless a statute of these rules permit otherwise, the government must
> prosecute an offense in a district where the offense was committed.
> The court must set the place of trial within the district with due
> regard for the convenience of the defendant, any victim, and the
> witnesses, and the prompt administration of justice.

Fed. R. Crim. P. 18.[7]  Therefore, and contrary to Petitioner's argument here, charges on bank

---

[6]  Petitioner's trial commenced on April 28, 2003 and he was sentenced on August 2,
2003.  United States v. Perry, No. 02-cr-00092 (N.D. Ohio) (Docs. 53 & 63).

[7]  Federal Rule of Criminal Procedure 20 provides in relevant part:

(a) Consent to Transfer. A prosecution may be transferred from the district where
the indictment or information is pending, or from which a warrant on a complaint
has been issued, to the district where the defendant is arrested, held, or present if:

(1) the defendant states in writing a wish to plead guilty or nolo contendere and to
waive trial in the district where the indictment, information, or complaint is
pending, consents in writing to the court's disposing of the case in the transferee
district, and files the statement in the transferee district; and

(2) the United States attorneys in both districts approve the transfer in writing.

***

(c) Effect of a Not Guilty Plea. If the defendant pleads not guilty after the case has
been transferred under Rule 20(a), the clerk must return the papers to the court
where the prosecution began, and that court must restore the proceeding to its
docket. The defendant's statement that the defendant wished to plead guilty or
nolo contendere is not, in any civil or criminal proceeding, admissible against the
defendant.

robbery committed in the Northern District were not properly joined for trial with Petitioner's charges of bank robbery in this Court in the Southern District.  Further, the period of delay attributed to resolution of Petitioner's jury trial in the Northern District constitutes a valid reason for delay weighing in the government's favor: "When a defendant violates the laws of several different sovereigns, as was the case here, at least one sovereign, and perhaps more, will have to wait its turn at the prosecutorial turnstile."  *United States v. Schreane,* 331 F.3d 548, 554 (6th Cir. 2003)(quoting *United States v. Grimmond*, 137 F.3d 823, 828 (4th Cir. 1998)).  Moreover, "'[s]imply waiting for another sovereign to finish prosecuting a defendant is without question a valid reason for delay'" that weighs in favor of the government.  *Id.* at 555 (quoting *Grimmond,* 137 F.3d at 828).  Here, "it was the defendant who demanded four different lawyers" before his trial in the Northern District could begin.  United *States v. Perry*, 114 Fed.Appx. at 671.  The record contains "no indication that the government or. . .  district court engaged in any undue delay or was, at any time unprepared to try the case.  Any blame for delay in this trial rests almost solely with the defendant."  *Id.*  Thus, the government's "patience" in allowing the Northern District of Ohio to complete trial proceedings against Petitioner is a valid reason for delay that weighs in favor of the government.  *See United States v. Schreane*, 331 F.3d at 555.  The remainder of the delay in bringing Petitioner to trial which, according to Petitioner, would have been from the seven months of time beginning September 2003 until March 22, 2004, was insufficient to trigger inquiry into the remaining *Barker* factors.

Further, the third factor of *Barker* also weighs in the government's favor, because Petitioner never asserted his right to a speedy trial in this Court.  To the contrary, he explicitly waived any objection to the government's January 22, 2004 request for a continuance.  *See* Doc. No. 14.

22

The fourth and final factor of the *Barker* balancing test requires the Court to determine the amount of prejudice that the defendant suffered. Prejudice must be assessed in view of the interests a speedy trial is designed to protect: 1) to prevent oppressive pretrial incarceration; 2) to minimize anxiety and concern of the accused; 3) to limit the possibility that the defense will be impaired. *Barker,* 407 U.S. at 532. The third interest is the most important. *Id.* According to Petitioner, he was prejudiced by the delay in bringing him to trial because he faced a more severe sentence, due to his convictions on criminal charges in the Northern District of Ohio. This argument, however, is not persuasive. *See United States v. Schreane,* 331 F.3d at 555 (citing *United States v. Thomas*, 55 F.3d 144, 150 n.6 (4th Cir. 1995))(rejecting this argument).

In sum, balancing the factors set forth in *Barker*, the record fails to reflect that Petitioner was denied his right to a speedy trial. *See United States v. DeJesus*, 887 F.2d 114, 116 n.1 (6th Cir. 1989)(declining to reach Sixth Amendment speedy trial claim upon resolution of claim under the Speedy Trial Act, noting "it will be an unusual case in which the time limits of the Speedy Trial Act have been met but the Sixth Amendment right to speedy trial has been violated")(quotations omitted). Consequently, Petitioner has failed to establish that his counsel was ineffective due to his attorney's failure to file a motion to dismiss the charges on this basis. He likewise has failed to establish the ineffective assistance of appellate counsel due to his attorney's failure to raise this issue on direct appeal. Moreover, the District Court did not abuse its discretion by failing to hold a hearing, or dismiss the indictment on this basis. *See Petition*, at 14.

**B.    Identification Testimony**

Petitioner asserts that he was denied the effective assistance of counsel because his attorney failed to file a motion to suppress testimony of Megan Bollmeyer, and refused to attack the

23

credibility of her identification of Petitioner at trial. *Petition,* at 6-7. Petitioner also complains that his attorney refused to subpoena the records related to Agent Trombitas' investigation to substantiate his claim that Bollmeyer's identification of him was unreliable.

Identification testimony based upon a pre-trial procedure that is so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" violates a criminal defendant's right to due process. *Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986)(quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)). "It is the likelihood of misidentification which violates a defendant's right to due process." *Neil v. Biggers*, 409 U.S. 188, 198 (1972). A court must first determine whether the pre-trial identification procedure employed was unduly suggestive. *Ledbetter v. Edwards*, 35 F.3d 1062, 1070-71 (6th Cir. 1994). If so, that Court must then consider the totality of the circumstances in order to determine if the identification is nevertheless reliable. *Id.* at 1070, citing *United States v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992); *Neil v. Biggers*, 409 U.S. at 199-200; *Thigpen v. Cory,* 804 F.2d at 895. In making this determination, the Court must consider the following five factors:

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention at the time of observation; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness when confronting the defendant; and (5) the length of time between the crime and the confrontation.

*Ledbetter v. Edwards,* 35 F.3d at 1070 (citations omitted).

The record fails to support Petitioner's claim that Bollmeyer's identification of him as the perpetrator was constitutionally impermissible and should have been suppressed. Upon receiving information from the FBI in Youngstown regarding a robbery of Bank One that had been carried out

24

in the same manner as the bank robbery of National City Bank, Special Agent Harry Trombitas created a photo array which included Petitioner's photograph and other individuals who seemed to share his physical characteristics. *Trial Transcript*, at 348-51. This photo array was introduced into evidence. Nothing in the record indicates that it was unduly suggestive or inappropriate. On February 8, 2002, within two months of the robbery, Trombitas showed the photo array containing six photographs to Megan Bollmeyer. *Id.* at 353-54. He made no suggestions to her in obtaining her identification of Petitioner as the armed bank robber. She immediately identified Petitioner without hesitation. *Id.* at 354. Further, and contrary to Petitioner's allegation here, she identified Petitioner as the robber in February 2002, before National City Bank fired her in May 2002. *See id.; see also Trial Transcript*, at 157-59, 168-69. She had no question regarding her identification of Petitioner as the bank robber at that time, indicating "you don't tend to forget someone who shoves a gun in your face." *Id.* at 169.[8] Nothing supports Petitioner's allegation that Agent Trombitas' investigative report contradicts the trial testimony of Trombitas and Bollmeyer regarding the date or certainty of her identification of Petitioner. *See Knowles v. Mirzayance*, ---U.S. ----, ----, 129

---

[8] In closing, defense counsel argued that Bollmeyer's identification of Petitioner was suspect, because at the time of trial she was only "fairly certain" of her in-court identification of Petitioner as the armed bank robber, and because she was not "the most trustworthy person in the world given her difficulties at the bank. . . ." *Trial transcript*, at 408-09. Defense counsel argued:

> She indicated that she thought she could make an identification when she came in to court, and she asked to have an opportunity to see Mr. Perry, and what I perceived to be a very pivotal moment in this trial, Mr. Perry came forward and displayed his teeth ... for Ms. Bollmeyer... and... after she looked at those teeth... her identification was shaken. Her confidence in her identification of Mr. Perry was shaken at that time.

*Id.* at 409.

S.Ct. 1411, 1420 (2009)(citing *Strickland,* at 690; *Thomas v. Varner,* 428 F.3d 491, 502 (3rd Cir. 2005) (It is not objectively unreasonable for counsel to decline to file a motion to suppress where the motion is plainly without merit or the evidence is of little probative value)).

## C.      Petitioner's Testimony at Trial

Petitioner asserts that his attorney refused to permit him to testify in his own behalf.  *See Petition,* at 8-9.[9]  Petitioner alleges:  On the last day of Perry's trial, when the Court asked if the defense had any more witnesses, Perry asked to speak on his own behalf.  His counsel said, "You have to trust me.  I have handled so many of these cases that I know what is required."  *Id.* at 9.

"The right to testify . . . on one's own behalf at a criminal trial . . . is one of the rights 'that are essential to due process of law in a fair adversary process.'"  *Rock v. Arkansas,* 483 U.S. 44, 51 (1987)(quoting *Faretta v. California,* 422 U.S. 806, 819 n. 15 (1975)).  The right is one of constitutional dimension, and "is subject only to a knowing and voluntary waiver by the defendant." *United States v. Webber,* 208 F.3d 545, 550 (6th Cir. 2000) (citations omitted).

> Although the ultimate decision whether to testify rests with the defendant, when a tactical decision is made not to have the defendant testify, the defendant's assent is presumed. *Joelson,* 7 F.3d at 177. This is so because the defendant's attorney is presumed to follow the professional rules of conduct and is "strongly presumed to have

---

[9] Respondent requests that Petitioner be ordered to submit a written waiver of his attorney-client privilege, so that respondent may obtain an affidavit from defense counsel to respond to this claim.  *See Return of Writ.*  Petitioner has waived his attorney-client privilege as it relates to his claims of ineffective assistance of counsel.  *See In re Lott,* 424 F.3d 446, 452-54 (6th Cir. 2005); *Bittaker v. Woodford,* 331 F.3d 715 (9th Cir. 2003); *Tasby v. United States,* 504 F.2d 332, 336 (8th Cir. 1974).  However, as discussed, *infra,* Petitioner's claim may be resolved based on the record already before this Court.

rendered adequate assistance" in carrying out the general duty "to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution." *Strickland v. Washington,* 466 U.S. 668, 688-90, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ...

A defendant who wants to testify can reject defense counsel's advice to the contrary by insisting on testifying, communicating with the trial court, or discharging counsel. *Joelson,* 7 F.3d at 177. At base, a defendant must "alert the trial court" that he desires to testify or that there is a disagreement with defense counsel regarding whether he should take the stand. *Pelzer,* 1997 WL 12125 at *2. When a defendant does not alert the trial court of a disagreement, waiver of the right to testify may be inferred from the defendant's conduct. Waiver is presumed from the defendant's failure to testify or notify the trial court of the desire to do so. *Joelson,* 7 F.3d at 177.

*United States v. Webber*, 208 F.3d at 551.

Petitioner failed to alert the District Court, at any time prior to the filing of this habeas corpus petition, that he wanted to testify on his own behalf. Therefore, this Court presumes Petitioner's waiver of his right to testify. He has, therefore, failed to support a claim for ineffective assistance of counsel on this basis.

## D.    Closing Argument

Petitioner complains that his attorney failed to inform the jury, in closing argument, that he was entitled to a not guilty verdict due to lack of evidence, particularly fingerprint evidence. *Petition,* at 67. The record reflects, however, that defense counsel argued during closing that the prosecution had presented insufficient evidence to establish Petitioner's guilt beyond a reasonable doubt. Specifically, defense counsel argued that, of the four people in the bank at the time of the robbery, only Bollmeyer identified Petitioner as the armed robber. He emphasized that her in-court

identification of Petitioner was "shaken" after she saw his teeth.  *Trial Transcript*, at 407-09.

Further, she was "not . . . the most trustworthy person in the world." *Id*. at 409.  Defense counsel

pointed out the lack of fingerprint evidence, failure of police to recover the $6,058 stolen from the

bank or evidence indicating Petitioner spent large sums of money after the robbery, lack of money

orders, and fact that people who knew Petitioner could not definitely identify him from the

surveillance photographs.  Counsel argued that all of the foregoing evidence reflected Petitioner's

innocence of the charges.  *Id*. at 410-16.

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Cf. Engle v. Isaac*, 456 U.S. 107, 133-134, 102 S.Ct. 1558, 1574-1575, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *See Michel v. Louisiana, supra*, 350 U.S., at 101, 76 S.Ct., at 164. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. *See Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U.L.Rev. 299, 343 (1983).

> ***

> [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.

> . . . [S]trategic choices made after thorough investigation of law and
> facts relevant to plausible options are virtually unchallengeable[.]

*Strickland*, 466 U.S. at 689-90. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead have emphasized that '[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" *Wiggins v. Smith,* 539 U.S. 510, 521 (2003)(quoting *Strickland,* at 688; *see also Moss v. Hofbauer*, 286 F.3d 851, 864 (6th Cir.2002)(failure to make opening statement and cross examine prosecution witness did not constitute ineffective assistance of counsel); *Campbell v. Coyle*, 260 F.3d 531, 551 (6th Cir. 2001)(perfect performance is not required under *Strickland.*) "[A]n ineffective-assistance-of-counsel claim cannot survive so long as the decisions of a defendant's trial counsel were reasonable, even if mistaken. *Id.* Petitioner has failed to establish the ineffective assistance of counsel based on his attorney's closing argument.

## E.        Conflict of Interest

Petitioner asserts that he was denied effective assistance of counsel due to a conflict of interest. Petitioner alleges:

> Attorney Hobson's decisions and overall performance did not display
> or follow any uniform reasoning or strategy. More than anything, it
> demonstrates his indifference to the outcome of Perry's case in
> general. Especially since Perry requested several steps to be taken
> which clearly had merit which Hobson ignored or outright refused.
> In that regard, Attorney Hobson's performance bordered on
> sabotage[.]

*Petition,* at 12.

Petitioner has a Sixth Amendment right to conflict-free counsel. *Gillard v. Mitchell*, 445 F.3d

883, 890 (6th Cir.2006)(citing *Smith v. Anderson,* 689 F.2d 59, 62-63 (6th Cir. 1982)).

> Defense attorneys owe their clients a duty of loyalty, including the duty to avoid conflicts of interest. *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ( citing to *Cuyler v. Sullivan,* 446 U.S. 335, 346, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)). However, a claim of a conflict of interest, by itself, is insufficient to justify reversal of a conviction. *Reedus v. Stegall*, 197 F.Supp.2d 767, 782 (E.D. Mich .2001) (citing to *United States v. Hall*, 200 F.3d 962, 966 (6th Cir. 2000); additional citations omitted). Instead, a habeas Petitioner must demonstrate "that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.'" *Reedus*, 197 F.Supp.2d at 782 (citing to *Strickland,* 466 U.S. at 692, 104 S.Ct.2052); See also *Mickens v. Taylor,* 535 U.S. 162, 122 S.Ct. 1237, 1244, n. 5, 152 L.Ed.2d 291 (2002)(actual conflict of interest, for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance).

*Whiting v. Burt,* 395 F.3d 602, 617 (6th Cir. 2005). Prejudice is presumed where a defendant demonstrates that an actual conflict of interest that compromised the attorney's ability to advocate the defendant's interests. *Id*. (citing *Olden v. United States*, 224 F.3d 561, 565 (6th Cir.2000)); *see also Gillard v. Mitchell*, 445 F.3d at 890 (citations omitted). However,

> [t]he presumed prejudice standard for ineffectiveness claims based on a conflict of interest detailed in *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), is inapplicable to cases of successive representations. *Lordi,* 384 F.3d at 193. *See also Smith v. Hofbauer,* 312 F.3d 809, 817 (6th Cir.2002)(refusing to extend *Sullivan* to an ineffective assistance of counsel claim based on an attorney's conflict of interest arising from anything other than joint representation), *cert. denied,* 540 U.S. 971, 124 S.Ct. 441, 157 L.Ed.2d 319 (2003); *Benge v. Johnson,* 312 F.Supp.2d 978, 994 (S.D. Ohio 2004)(refusing to apply the *Sullivan* standard outside the concurrent joint representation context).

*Whiting v. Burt*, 395 F.3d at 618. A trial court must conduct an inquiry into an alleged conflict where it knows or reasonably should know that a particular conflict exists, not "when the trial court is

30

aware of a vague, unspecified possibility of conflict, such as that which 'inheres in almost every instance of multiple representation,'" *Mickens v. Taylor,* 535 U.S. 162, 168-69 (2002)(quoting *Cuylar v. Sullivan*, 446 U.S. 335, 347-48 (1980)(footnote omitted).

On March 12, 2004 and March 16, 2004, approximately one week prior to trial, Petitioner wrote the District Court requesting the appointment of Jerry Simmonds as new defense counsel, alleging that he had a "severe conflict of interest" with his appointed attorneys. *Trial Transcript*, at 2.

> [Petitioner] says that they have told him that they are not interested in preparing to defend the case for trial, that they are not representing him to the best of their ability or keeping him informed of the developments in the case, or consulting with him on the issues pertaining to his defense.
>
> He says that his counsel are allowing the assistant U.S. attorneys to make allegations which have been proven to be untrue; and that his counsel have made statements which they know are false; and that they have not prepared for the trial; and that for all of these reasons, it's impossible to proceed to trial with his current counsel.

*Id*. at 2-3. The District Court inquired of Petitioner regarding the reasons he believed he should be appointed new counsel. Petitioner stated that his attorneys had come to the jail to talk with him about the preparation for trial three or four times, he had talked to them over the telephone, and they had written him two letters. *Id.* at 4-5.

> COURT: Can you be a little more specific about the difficulties you have been having?
>
> DEFENDANT PERRY: Well, let me see. Basically, it is just like I said, they haven't really prepared, as far as I can tell, for the trial. Issues that were discussed, they didn't have any recollection of. Basically, things they said they were going to do or not do, they

31

> didn't keep up to date on their end of the agreement... stuff like that.

> COURT: All right.  Anything more specific you would like for me to consider?

> DEFENDANT PERRY: Other than the most damaging, I guess, would be allowing, like I said, false allegations that they knew were false to still be presented or brought up by assistant U.S. attorney.

*Id.* at 5.  Petitioner complained that the government was planning to use evidence of the other bank robbery charges against him at trial and this evidence was false.  *Id.* at 6-7.  The District Court explained to Petitioner that his attorneys had filed a motion *in limine* objecting to introduction of that evidence.  *Id*. at 6.  Attorney Hobson stated that they had discussed the case with Petitioner and were prepared to go to trial.  They had communicated to Petitioner the plea offers extended by the government, and explained the possible penalties involved in the case and the consequences of a plea agreement.  *Id.* at 8.  Mr. Hobson also indicated that the defense was prepared to proceed:

> Perhaps by communicating plea offers to Mr. Perry, he assumed that we were not on his side or didn't care about him or just simply didn't want to do the work to prepare for trial, but I can tell the Court that we have put a lot of time in and we are ready to go forward today.

Id., at 8-9.  Attorney Hobson had not had any specific disagreements with Petitioner regarding his defense.  He had not had any problems communicating with Petitioner in regard to his defense.  *Id.* He had discussed with Petitioner the legal theories of the defense.  *Id*. at 10.  Attorney Messmer had met with Petitioner about six times.  She described her interactions with Petitioner as cordial, and had reviewed with him the discovery and evidence against him.  *Id*. at 11.  She also was prepared to proceed to trial.  *Id.*   Petitioner had not hired Attorney Simmonds, but wanted the Court to appoint Simmons free of charge.  *Id*. at 13-14.  The Court found that Petitioner failed to show good

cause for the replacement of counsel and denied his request.  *See id.* at 14-16.

> [T]he purpose of providing assistance of counsel "is simply to ensure that criminal defendants receive a fair trial," *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984), and that in evaluating Sixth Amendment claims, "the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such." *United States v. Cronic,* 466 U.S. 648, 657, n. 21, 104 S.Ct. 2039, 2046 n. 21, 80 L.Ed.2d 657 (1984). Thus, while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers. See *Morris v. Slappy,* 461 U.S. 1, 13-14, 103 S.Ct. 1610, 1617-1618, 75 L.Ed.2d 610 (1983); *Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983).

*Wheat v. United States*, 486 U.S. 153, 159 (1988).

In this case, Petitioner fails to demonstrate that his attorney had  a conflict of interest.  His claim for ineffective assistance of counsel for this purported reason, therefore, fails.

## F.    Appellate Counsel

Petitioner additionally asserts that he was denied effective assistance of appellate counsel because his attorney refused to raise on appeal all of the claims he requested.  Specifically, Petitioner complains that his attorney failed to raise on appeal claims that the District Court improperly denied his request for the appointment of new counsel; judicial misconduct; and that he unconstitutionally was sentenced.  *Petition*, at 34.  "Defense counsel has no obligation to raise every issue argued by the defendant or to raise frivolous issues on appeal."  *Neeley v. United States*, 2008 WL 2558013 (E.D. Tenn. June 23, 2008).  No decision of the United States Supreme Court "suggests . . . that the indigent defendant has a constitutional right to compel appointed counsel to press nonfrivolous

points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983); *see also McFarland v. Yukins*, 356 F.3d 668, 710 (6th Cir. 2004)("the decision of which among possible claims to pursue is ordinarily entrusted to counsel's professional judgment.")

For the reasons already discussed, because all of the foregoing claims lack merit, Petitioner has failed to establish ineffective assistance of appellate counsel due to his attorney's failure to raise these claims on direct appeal.

Claims one and six are without merit.

## CLAIM TWO:  JUDICIAL MISCONDUCT AND BIAS

In claim two, Petitioner asserts that he was denied due process due to judicial misconduct and bias of the District Judge.  *Petition*, at 13.  As grounds for this allegation, Petitioner complains that the District Court denied his request for the appointment of new counsel; failed to dismiss the indictment against him as in violation of his right to a speedy trial; and erroneously permitted admission of other-acts evidence involving bank robbery charges against him in the Northern District of Ohio.  *Id*. at 14-15.  In support of this claim, Petitioner states that the District Judge recused himself from the case prior to sentencing.  This claim plainly lacks merit.

Under 28 U.S.C. § 455(a), a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  Such circumstances include "where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding[.]" 28 U.S.C. § 455(a)(1).  A district judge is required to recuse himself or herself "'only if a reasonable person with knowledge of all the facts would conclude that the judge's

34

impartiality might reasonably be questioned.'" *United States v. Story*, 716 F.2d 1088, 1091 (6th Cir. 1983)(quoting *Trotter v. International Longshoremen's & Warehousemen's Union*, 704 F.2d 1141, 1144 (9th Cir. 1983)).  This standard is objective, not based on the subjective view of the party. *United States v. Sammons*, 918 F.2d 592, 599 (6th Cir. 1990); *Wheeler v. Southland Corp.*, 875 F.2d 1246, 1251 (6th Cir. 1989).

A judge must recuse himself or herself when the objective appearance of impartiality standard presents a close question.  *Union Planters Bank v. L & L Dev. Co., Inc.*, 115 F.3d 378, 383 (6th Cir. 1997).  As the late Chief Justice Rehnquist noted, however, "a federal judge has a duty to sit where not disqualified which is equally as strong as the duty to not sit where disqualified." *Laird. v. Tatum*, 409 U.S. 824, 837 (1972)(emphasis omitted).

Under 28 U.S.C. § 144,

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

Petitioner has not filed an affidavit with his motion.  In any event, Petitioner has failed to set forth any facts indicating bias or prejudice on the part of the District Judge who presided over his trial.

To warrant recusal . . . the alleged facts "must relate to extrajudicial conduct rather than judicial conduct. In other words, the affidavit must allege facts showing a personal bias as distinguished from a judicial one, arising out of the judge's background and association and not from the judge's view of the law." *Id.* (internal citations omitted).

Here, the allegations of bias or prejudice do not stem from any extra-judicial circumstance. Rather, it is precisely this Court's *judicial* conduct, namely adverse rulings on various post-trial motions, which Defendant cites as the basis of his allegation of bias. Defendant's unhappiness with this Court's ruling cannot form the basis for a recusal.

*Poole v. United States*, 2009 WL 2392927 (N.D. Ohio July 31, 2009).

Disqualification must be predicated on extrajudicial conduct rather than judicial conduct. *United States v. Story*, 716 F.2d 1088, 1091 (6th Cir. 1983). Appellant herein does not allege that the trial judge should have recused himself on the basis of personal bias, but bases his contention that the trial judge was biased because of the judicial proceedings over which the judge presided. Appellant fails to show that the trial court was personally biased against him. *See In Re M. Ibrahim Khan*, P.S.C., 751 F.2d 162 (6th Cir. 1984). Consequently, there is no showing of actual prejudice resulting from any actions of the trial judge.

*Zimmer v. United States*, 780 F.2d 1024 (Table), unpublished, 1985 WL 13998, at *1 (6th Cir. Nov. 15, 1985).

The District Judge's recusal from proceedings related to sentencing does not support Petitioner's claim. On April 5, 2004, April 26, 2004, and June 8, 2004, Petitioner wrote letters to the District Judge indicating that he would be filing a lien against the Judge.[10] *See Attachments to*

---

[10] Petitioner's June 8, 2004, letter indicated:

[Judge] Graham:

*Supplemental Addendum to PreSentence Investigation Report.*  On June 8, 2004, Judge Graham thus

recused himself from further proceedings.  (*See* Doc. 33.)  The District Judge's recusal at this late

stage of the proceeding provides no basis from which to conclude that Petitioner was denied a fair

trial due to judicial bias.  Moreover, the United States Court of Appeals for the Sixth Circuit

affirmed this Court's ruling on admission of evidence regarding the Bank One robbery:

> Perry first contends that the district court abused its discretion by
> admitting evidence of the subsequent Bank One robbery pursuant to
> Rule 404(b). Perry asserts that because the robberies occurred over
> a month apart and over one hundred miles away from one another,
> the crimes were too remote in time and space to merit admission of
> evidence related to the Bank One robbery. Perry further argues that
> requesting change for a $50 bill, coupled with the purchase of money
> orders, is not a sufficiently unique set of facts to constitute "some sort
> of behavioral fingerprint." Moreover, the evidence was unduly
> prejudicial in violation of Fed. R. Evid. 403. For these reasons, Perry
> concludes, the district court abused its discretion by admitting
> evidence of the subsequent Bank One robbery. We disagree.
>
> As a fundamental premise, Fed. R. Evid. 404(b) prohibits the
> introduction of evidence of other crimes or wrongs or acts "to prove
> the character of a person in order to show action in conformity
> therewith." At the outset, Perry concedes the first *Mack* inquiry;
> namely, he admits that Bank One was robbed. The question therefore
> becomes whether the district court admitted evidence of the

---

I have mailed you a "Coloring Agreement" in an attempt to correct the ruling you
made concerning the above mentioned case which resulted in constitutional and
federal rules of criminal procedure violations.  I have exhausted all other means
of remedy by law which is why I filed the "Coloring Agreement."  You have been
given three chances to comply by correcting the error of using evidence from a
prior conviction against me on this case without me taking the stand.  If you
review the agreement under colorable law, you will note the penalties for failure
to comply.  I have the lien against you ready for submittal in the event that the
error made in the above mentioned case is not corrected by the sentencing hearing
concerning this case. . . .

*See Attachments to Supplemental Addendum to PreSentence Investigation Report.*

37

subsequent Bank One robbery for a proper purpose. Rule 404(b) expressly allows for the admission of "other act" evidence when offered to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident[.]" Significantly, the list provided by 404(b) is not exhaustive. *United States v. Hardy*, 228 F.3d 745, 750 (6th Cir. 2000).

In this case, the district court expressly recognized that "identity is the largest single issue in this case, that is, the identity of the perpetrator of the robbery of the National City Bank[.]" In such a case, when the issue is one related solely to identity, this Court has overwhelmingly approved of the admission of "other acts" evidence. *E.g., United States v. Fountain,* 2 F.3d 656, 668 (6th Cir. 1993).

The district court also observed that the circumstances surrounding the NCB and Bank One robberies, alongside Perry's conduct at the Metropolitan Bank, were unique and therefore created a "signature." Such a determination was appropriate; unlike two completely unrelated robberies, Perry entered both NCB and Bank One carrying a gun in a bookbag and seeking change for $50. *Cf. United States v. Phillips,* 599 F.2d 134, 137 (6th Cir. 1979). Upon receiving his change, Perry sought to purchase money orders and only after doing so did he remove his gun. Although Perry points to certain distinctions between the two robberies, "[i]t is not necessary ... that the crimes be identical in every detail." *United States v. Hamilton,* 684 F.2d 380, 385 (6th Cir. 1982). Thus, given that two crimes of sufficient distinctive similarity can create a pattern or modus operandi, *see United States v. Woods,* 613 F.2d 629, 635 (6th Cir. 1980), the district court admitted evidence of the Bank One robbery for a proper purpose, accord *Hamilton*, 684 F.2d at 384-85.

The inquiry then turns to determining whether the district court properly balanced the prejudicial impact and probative value pursuant to Fed. R. Evid. 403. In doing so, we "look at the evidence in a light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Zipkin*, 729 F.2d 384, 389 (6th Cir. 1984). Significantly, although a district court should exclude evidence pursuant to Rule 403 "only where the probative value of the relevant evidence is *substantially* outweighed by the danger of unfair prejudice [,]" *United States v. Hans*, 684 F.2d 343, 346 (6th Cir. 1982) (citations omitted), the court should nonetheless issue a limiting instruction establishing the basis for the

> inclusion of the Rule 404(b) evidence, *United States v. Ward*, 190 F.3d 483, 489-90 (6th Cir. 1999).
>
> In this case, evidence of Perry's participation in the subsequent Bank One robbery was not sufficiently prejudicial to render it inadmissible. Prior to the admission of the Bank One evidence, the district court gave the jury an appropriate limiting instruction, which it repeated several other times throughout the trial. *See United States v. Holloway,* 740 F.2d 1373, 1377 (6th Cir.1984). As a result, the district court did not abuse its discretion when admitting evidence of the subsequent bank robbery on the limited issue of Perry's identity.

*United States v. Perry*, 438 F.3d at 648.

Claim two is without merit.

## CLAIM THREE: USE OF RESTRAINTS AT SENTENCING

In claim three, Petitioner asserts that he was denied due process because at his sentencing and re-sentencing hearing, "he was made to wear full restraints which included handcuffs, belly chain and shackles" without a prior assessment by the Court regarding whether he imposed a risk of flight or threat. *Petition*, at 19. This claim should have been raised on direct appeal, but was not. Therefore, Petitioner must show cause why he did not previously object and "actual prejudice" resulting from the error. *Napier v. United States*, 159 F.3d 956, 961 (6th Cir. 1998)(citing *United States v. Frady,* 456 U.S. 152, 167-68 (1982)). Petitioner cannot meet these requirements here. His claim is plainly without merit.

Generally, a criminal defendant "should not be compelled to go to trial in prison or jail clothing because of the possible impairment" of the presumption of innocence guaranteed as part of a defendant's due process right to a fair trial. *Estelle v. Williams*, 425 U.S. 501, 504 (1976). This holding extends to a defendant's appearance in handcuffs and shackles.

> Exposure of the jury to a defendant in shackles requires a mistrial only when the exposure is so "inherently prejudicial" as to deny the defendant's constitutional right to a fair trial. *United States v. Pina,* 844 F.2d 1, 8 (1st Cir. 1988). We have distinguished the inherent prejudice to a defendant who is shackled while in the courtroom from a defendant who has been observed in shackles for a brief period elsewhere in the courthouse. Defendants are required to show actual prejudice where "[t]he conditions under which defendants were seen were routine security measures rather than situations of unusual restraint such as shackling of defendants during trial."

*United States v. Waldon,* 206 F.3d 597, 607 (6th Cir.2000); *see Deck v. Missouri*, 544 U.S. 622 (2005)(Constitution prohibits routine use of visible shackles during guilt phase of criminal trial). These cases, however, apply to jury trial proceedings, not sentencing hearings conducted by the District Judge.  *See, e.g., United States v. Howard*, 480 F.3d 1005 (9th Cir. 2007); *United States v. Zuber*, 118 F.3d 101, 104 (2nd Cir. 1997).

Therefore, Petitioner has failed to establish cause and prejudice for failing to raise claim three on direct appeal.

## CLAIM FOUR: INSUFFICIENCY OF THE EVIDENCE

In claim four, Petitioner argues at length that the evidence was insufficient to sustain his convictions.  *Petition,* at 21-26.  Claims of insufficiency of the evidence are not properly considered in § 2255 proceedings.  *See Ajan v. United States*, 2009 WL 1421183 (E.D. Tenn. May 20, 2009) (citing *Scott v. Morrison*, 58 Fed.Appx. 602 (6th Cir. 2002)); *see also United States v.* Curtis, 2007 WL 896171 (E.D. Tenn. March 22, 2007)("The United States Court of Appeals for the Sixth Circuit has consistently held that the 'sufficiency of the evidence to support a conviction may not be collaterally reviewed [in] a §2255 proceeding'")(quoting *United States v. Osborn*, 415 F.2d 1021, 1024 (6th Cir. 1969); *Stephan v. United States,* 496 F.2d 527, 528-29 (6th Cir. 1974)).

Therefore, claim four is without merit.

### CLAIM FIVE: IMPOSITION OF SUPERVISED RELEASE

Although the crux of his argument is not entirely clear, in claim five, Petitioner asserts that the District Court unconstitutionally sentenced him to a term of supervised release.  Again, this claim should have been raised on direct appeal, but was not.  Therefore, Petitioner must show cause why he did not previously object and "actual prejudice" resulting from the error.  *Napier*, 159 F.3d at 961. Petitioner cannot meet these requirements here.  His claim is plainly without merit.

Under 18 U.S.C. § 3583, a District Court may impose "as a part of the sentence a requirement that the defendant be placed on a term of supervised release after imprisonment." *Id.* The imposition of supervised release under this statutes violates neither the Double Jeopardy Clause nor the doctrine of separation of powers.  *See United States v. Sanchez*, Nos. 08-cv-243-bbc, 06-cr-88-jcs, 2008 WL 4621141 (W.D. Wisc.  June 9, 2008)(rejecting these same arguments):

> Contrary to defendant's assertion, when courts impose a term of supervised release, they do so under § 3583(a) and do not infringe on Congress's power to determine punishments.

> . . .  Even if the term of supervised release is considered a separate punishment for defendant's criminal conduct, which it is not, imposition of supervised release would not violate the constitutional protection against being twice put in jeopardy for the same offense. *Missouri v. Hunter*, 459 U.S. 359, 368, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983) (where Congress intends to impose double punishments, it is not double jeopardy for court to impose both intended punishments).

*Id.; see also Brooks v. United States,* No. 00-CV-2336, 2009 WL 2707371 (E.D.N.Y. Aug. 25, 2009):

41

> The Second Circuit has rejected the contention that the imposition of supervised release constitutes double jeopardy. "A defendant who is sentenced to supervised release is only punished once for his crime . . . [The] length and type of that punishment are governed by two different statutes: the underlying criminal statute and § 3583." Pettus, 303 F.3d at 486 (citing *United States v. Wirth*, 250 F.3d 165, 170 n. 3 (2d Cir. 2001)); *United States v. Meeks*, 25 F.3d 1117, 1121 (2d Cir. 1994) ("[s]upervised release, like parole, is an integral part of the punishment for the underlying offense."). Moreover, a term of incarceration resulting from a violation of supervised release does not violate double jeopardy. *See United States v. Carlton*, 442 F.3d 802, 809 (2d Cir. 2006) (a sentence for violation of supervised release is "part of the penalty for the initial offense"); *United States v. Pettus*, 303 F.3d 480, 487 (2d Cir. 2002) (the "requirement that a defendant only be punished once for a particular crime does not mean that this punishment cannot be modified or extended."); *United States v. Vargas*, 564 F.3d 618, 624 (2d Cir. 2009) ("[r]einstatement of supervised release after it is revoked does not place the defendant in double jeopardy because postrevocation penalties are attributable to the original conviction and are not new punishments.").

*Id.; see also Pugh v. United States*, Nos. 4:06-CV-7 (CDL), 4:99-CR-08 (CDL), 2006 WL 1652320 (M.D. Georgia June 12, 2006)(same).  Further, "The Supreme Court has never held that the supervised release portions of the Sentencing Reform Act, 21 U.S.C. § 3553, *et seq.*, are unconstitutional.  It merely made the sentencing Guidelines advisory rather than mandatory." *Escobar v. United States*, No. 1:01:CR:235-1, 2009 WL 198268 (W.D. Michigan 2009)(citing *United States v. Booker*, 543 U.S. 220, 246-47 (2005)).

> Supervised release under 18 U.S.C. § 3583 "is constitutional under *Apprendi, Blakely*, and *Booker*." *United States v. Huerta-Pimental*, 445 F.3d 1220, 1221 (9th Cir.2006), citing *Apprendi*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435, *Blakely,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403, and *Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621. "Supervised release 'as part of a sentence' is expressly authorized by § 3583 whether or not it is mandated by a statute of conviction or otherwise." *Huerta-Pimental*, 445 F.3d at 1222, citing 18 U.S.C. § 3583(a) (1988).

*United States v. Gonzalez-Albarran*, No. 06CR1037-LAB, 2007 WL 2345034 (S.D. Cal. Aug. 14, 2007).

Petitioner has failed to establish cause and prejudice for his failure to raise claim five on direct appeal.

## CONCLUSION

For all the foregoing reasons, the Magistrate Judge **RECOMMENDS** that Petitioner's motion to amend his § 2255 petition be **DENIED,** with the exception of his request to amend the language of habeas corpus claim five.  The Magistrate Judge further **RECOMMENDS** that this action be **DISMISSED**.

Petitioner's motion to disqualify the government's reply (Doc. 78), is **DENIED.**  His motion to supplement his habeas corpus petition with copies of pages of the trial transcripts, (Doc. 90), is **GRANTED**.  Petitioner's motion to proceed *in forma pauperis* (Doc. 89), is **DENIED**, as moot.

## PROCEDURE ON OBJECTIONS

If any party objects to this *Report and Recommendation*, that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit

this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn*, 474 U.S. 140 (1985);*United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

**DATE:  December 20, 2010**                                 __*/s/ Elizabeth A. Preston Deavers*__
                                                             **Elizabeth A. Preston Deavers**
                                                             **United States Magistrate Judge**